UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RHONDA ROEBER,

          Plaintiff,

vs.                                              Case No. 8:07-cv-954-T-24EAJ

DOMINIK MAKOWIECKI and
JAMES BRUSOE,

          Defendants.
_____

## **O R D E R**

This cause is before the Court on Defendant James Brusoe's (Brusoe) motion for summary judgment based on qualified immunity (Doc. No. 13) and Plaintiff Roeber's (Roeber) response to the motion. (Doc. No. 14). A review of the record demonstrates that, for the following reasons, Defendant Brusoe's motion for summary judgment based on qualified immunity must be granted.

Procedural Background

On June 6, 2007, Roeber, through counsel, filed a 42 U.S.C. § 1983 complaint for purported violations of her federal constitutional rights. Roeber names as Defendants, two Sarasota County Sheriff's deputies, Dominik Makowiecki and James Brusoe, each in his individual capacity. (See Complaint at 1). In Count I, Roeber alleges Makowieck deprived Roeber of her "constitutional right to be free from excessive force guaranteed by the Fourteenth Amendment." (Complaint at ¶ 17). In Count II, Roeber alleges Brusoe deprived

Roeber of her "constitutional right to be free from excessive force guaranteed by the Fourteenth Amendment." (Complaint at ¶ 22).

## Undisputed, Material Facts

On January 30, 2007, Brusoe was on duty as a Sarasota County Sheriff's deputy, assigned to the Sarasota County Jail (Jail) as a corrections officer. (Brusoe's Deposition at 8). At that time, Brusoe was in his first year of employment as a Sarasota County Sheriff's deputy, was considered a "probationary" officer, and continued in his "probationary period" until June 2007. (Brusoe's Deposition at 4-5). On January 30, 2007, Makowiecki was also on duty at the Jail. Brusoe considered Makowiecki his "superior deputy," and someone Brusoe would "look to for guidance" *because* Brusoe was in his probationary period as a corrections officer. (Brusoe's Deposition at 9-10).

Brusoe first encountered Roeber in the sally port of the Jail after Brusoe had returned from the South County Jail. (Brusoe's Deposition at 13, 19). Brusoe's initial observations of Roeber "left him with the impression" that she was intoxicated because she smelled of alcohol and had slurred speech.[1] (Brusoe's Deposition at 19). Brusoe further observed Roeber in handcuffs, standing with another officer. (Brusoe's Deposition at 21). A female deputy processed Roeber's property in preparation for Roeber's being taken to a holding cell. (Brusoe's Deposition at 23-26; Roeber's Deposition at 76).

At some point before Roeber was taken to the holding cell, Brusoe heard Roeber say that she could not finish her usual daily amount of alcohol, two to three bottles of wine,

---

[1] Roeber testified in her deposition that she was not "under the influence of alcohol" when she was taken to the Jail on January 30, 2007. (Roeber's Deposition at 73). However, Brusoe does not assert in his deposition that Roeber was intoxicated; only that she appeared to be intoxicated.

before she was taken into custody. (Brusoe's Deposition at 21-22; Roeber's Deposition at 78-81).

Roeber recalled telling Jail staff in completing intake procedures during her previous Sarasota County Jail stays, that she typically consumed two to three bottles of wine per day. However, she did not recall telling Jail staff about her typical daily consumption of alcohol when she was taken into custody on January 30, 2007. (Roeber's Deposition at 78-81). When pressed at deposition, Roeber stated that on January 30, 2007, she might have told intake Jail staff that she was drinking and that she typically drank two to three bottles of wine a day so that she could go to the "drunk tank" and "get some valium." (Roeber's Deposition at 80). The information on Roeber's January 30, 2007, screening form reflects that intake Jail staff reported she had been drinking on January 30, 2007, and that she typically drank two to three bottles of wine a day. (Roeber's Deposition at 79-80).

After the intake procedure was complete, Roeber was taken to a holding cell, which she occupied along with "two or three other women." (Roeber's Deposition at 93). At some point prior to the subject incident, the other women were removed from the cell, leaving Roeber alone in the holding cell. (Roeber's Deposition at 95-97; Makowiecki's Deposition at 16).

Roeber testified, in her deposition, that both before and after the women were removed from the holding cell, Roeber repeatedly asked for water. (Roeber's Deposition at 95). At some point after the other women were removed from the cell, Roeber's demands for water included, at least "three or four times," banging on the door of the holding cell. (Roeber's Deposition at 98-100; Brusoe's Deposition at 27, 31-32; Makowiecki's Deposition at 13-14).

In response to Roeber's banging on the cell door, Brusoe approached the door of Roeber's cell to address the situation.[2] (Brusoe's Deposition at 31-32). Brusoe asked Roeber what the problem was, and Roeber responded with profanity and a demand for water. (Brusoe's Deposition at 32-34; Roeber's Deposition at 111-112).

Brusoe then walked away from Roeber's cell, and returned approximately five minutes later; his return resulted in another demand for water by Roeber. (Brusoe's Deposition at 34-36). Water is regularly available from the sink inside each cell. (Brusoe's Deposition at 36).

Brusoe discussed Roeber's situation with Makowiecki, and with Lieutenant Lamb, who had just arrived on the scene. (Brusoe's Deposition at 37-38; Makowiecki's Deposition at 18-19). After discussing the situation, the three deputies decided to provide the water Roeber had been demanding. They approached Roeber's cell with a cup and pitcher of water. (Bruscoe's Deposition at 37-38; Makowiecki's Deposition at 18-19). As the deputies approached Roeber's cell, they could see water "rushing underneath the door… as fast as it possibly can." (Brusoe's Deposition at 39 (quote); Makowiecki's Deposition at 18-19). Makowiecki observed Roeber inside the cell, standing next to the toilet, flushing the toilet. (Makowiecki's Deposition at 19; Roeber's Deposition at 103 [Roeber admits to flushing the toilet at least one time]).

Lieutenant Lamb instructed Brusoe and Makowiecki to enter the cell and "two-point" Roeber. (Brusoe's Deposition at 39; Makowiecki's Deposition at 21). A "two-point" consists

---

[2] Roeber's testimony was that she did not recall the identity of any officers who came to the door of her cell prior to the incident that is the subject of this complaint. However, she does recall officers coming to the door before the incident. (Roeber's Deposition at 99-100). Roeber further recalls that every time an officer went by her cell, she would ask for water. (Roeber's Deposition at 97-98).

of handcuffing one hand and one leg to a bench inside the cell. (Brusoe's Deposition at 40-41). An additional officer, Deputy Sleeman, unlocked Roeber's cell so that Makowiecki and Brusoe could enter. (Brusoe's Deposition at 41-42). Makowiecki entered Roeber's cell first, with Brusoe following. (Makowiecki's Deposition at 22; Brusoe's Deposition at 42).

The deputies observed Roeber standing on top of a bench inside the cell. (Makowiecki's Deposition at 22; Brusoe's Deposition at 42; Roeber's Deposition at 109). Brusoe further observed something stuffed inside the toilet. The object in the toiled looked like a roll of toilet paper. Brusoe did not see human waste either in the toilet or on the cell floor, which measured eight to nine feet from the toilet to the cell door. (Brusoe's Deposition at 42-43). Makowiecki ordered Roeber to get down from the bench; however, Roeber did not voluntarily get down from the bench. (Makowiecki's Deposition at 22-23; Brusoe's Deposition at 45-46).

Roeber testified that she did not hear anybody tell her to get down from the bench when the deputies entered the cell. (Roeber's Deposition, at 109-110). However, Roeber further testified that when the deputies entered the cell, prior to Makowiecki's bringing her down from the bench, she was "hollering." (Roeber's Deposition at 111). Both Makowiecki and Brusoe testified that after they entered the cell and before Roeber was taken down from the bench, Roeber was cursing at them. (Makowiecki's Deposition at 22; Brusoe's Deposition at 46). Thus, while it is possible that Roeber failed to hear Makowiecki and Brusoe's orders to get down from the bench because she was "hollering," this fact does not establish that Makowiecki and Brusoe never gave such an order.

When Roeber would not voluntarily get down from the bench, Makowiecki forcibly pulled Roeber down from the bench and placed her face down on the cement floor.

5

(Makowiecki's Deposition at 23-25; Brusoe's Deposition at 48-49). After Roeber was on the floor, Brusoe's task was to cuff one of Roeber's legs to the bench as part of the "two-point" maneuver. (Brusoe's Deposition at 51). Brusoe's efforts to cuff her leg to the bench were hindered by Roeber's kicking her legs. (Brusoe's Deposition at 52-53; Roeber's Deposition at 118-119 [Roeber does not remember whether she was kicking]).

Brusoe finally gained control of Roeber's left ankle with a "soft empty hand technique," and shackled her right leg to the bench. While Brusoe controlled Roeber's legs, Makowiecki placed his knee in Roeber's back and handcuffed her right arm to the bench. (Makowiecki's Deposition at 27-28; Brusoe's Deposition at 53; Roeber's Deposition at 117 [Roeber recalled "lunge to my back"]). Brusoe did not observe any signs that Roeber was in physical pain during this manuever. (Brusoe's Deposition at 55-56). However, Roeber testified that she lost consciousness, and continued to go "in and out of consciousness" during this time. (Roeber's Deposition, at 117, 122).

After securing Roeber to the bench, Brusoe and Makowiecki left the cell. (Brusoe's Deposition at 58; Makowiecki's Deposition at 36). Brusoe periodically checked on Roeber and he did not observe any signs that she was in any pain. Ultimately Brusoe released Roeber from the "two-point" restraint. (Brusoe's Deposition at 60-61).

The next day, January 31, 2007, Roeber was transferred from the Jail to Sarasota Memorial Hospital where she had surgery for a ruptured spleen and treatment for a non-displaced left rib fracture. Roeber also had a "tiny fracture" of the left L2 transverse process.[3] (Complaint at ¶ 14; Roeber's Deposition at 133; Schremmer's Deposition at 10-13

---

[3] The left L2 transverse process is a small, wing-like appendage that comes off one of the lumbar vertebrae. It is located close to the same area as Roeber's rib fracture. (Schremmer's Deposition at 12-13).

6

and Exhibits 1 and 2 in Doc. No. 15).

The complaint alleges that Roeber's injuries were caused by the Defendants' taking Roeber down from the bench, placing Roeber on the floor, grabbing and twisting Roeber's arm, and pinning Roeber "to the floor by the knee of one of the Defendants." None of the deposition testimony establishes that Brusoe performed any of those specific actions. (Complaint at ¶¶ 10-12). Brusoe's involvement in the incident was limited to securing one of Roeber's legs and shackling the leg to the bench and periodically checking on her after she was restrained.

### Brusoe's Motion for Summary Judgment

Brusoe contends that he is entitled to summary judgment based on qualified immunity because the undisputed, material facts fail to establish that Brusoe violated Roeber's Fourteenth Amentment right to be free from excessive use of force. He also contends that even if Roeber could prove that Makowiecki violated her constitutional right to be free from excessive use of force, she cannot demonstrate Brusoe either anticipated the unlawful use of excessive force by Makowiecki or was in a position to intercede against the unlawful use of excessive force by Makowiecki.

### Roeber's Response in Opposition to Brusoe's Motion for Summary Judgment

Roeber does not address Brusoe's motion for summary judgment based on qualified immunity. Instead, Roeber lists eight disputed issues, which she claims are genuine issues of material fact precluding summary judgment, for Brusoe.

None of these issues raise genuine issues of material fact that preclude summary judgment for Defendant Brusoe.

**Standard of Review for Qualified Immunity**

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting 'within the scope of his discretionary authority.' " *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir.2004) (quoting *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir.1995)).

Once it is established that the Defendant was acting within his discretionary authority, the burden shifts to the Plaintiff to prove that qualified immunity is not warranted. *Vinyard*, 311 F.3d at 1346. The Supreme Court has articulated a two-part test in the qualified immunity analysis. First, the court must determine whether the Plaintiff's allegations establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that the court must evaluate the complaint to determine if, assuming the allegations are true, it pleads a cognizable violation of the constitution). If this is answered in the affirmative, the court's next step is to determine whether the constitutional right in question was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (stating that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.")). In essence, a

Defendant is entitled to "fair warning" that his alleged conduct would be unconstitutional. *Hope*, 536 U.S. at 741.

Roeber must satisfy both prongs set out in *Saucier* to establish the inappropriateness of extending qualified immunity to Brusoe in this matter. As the Supreme Court has announced: "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* at 202.

In the Eleventh Circuit, "for the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors in the defendants' place, that what he is doing violates federal law." *Jenkins v. Talladega City Board of Education*, 115 F.3d 821, 823 (11th Cir. 1997)(en banc)(citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"[A] public official is entitled to qualified immunity unless, at the time of the incident, the preexisting law dictates, that is, truly compel[s], the conclusion for all reasonable similarly situated public officials that what [the official] was doing violated [the plaintiff's] federal rights in the circumstance." *Wilson v. Zellner*, 200 F.Supp. 2d 1356, 1360 (M.D. Fla. 2002), (citing *Marsh v. Butler County*, 268 F.3d 1014, 1030-31 (11th Cir. 2001)(en banc)).

**Defendant Brusoe Is Entitled to Qualified Immunity**

It is undisputed that on January 30, 2007, Defendant Brusoe was acting within his discretionary authority as a law enforcement officer. Therefore, the burden shifts to Roeber to show that qualified immunity is not warranted. Roeber must demonstrate that her allegations establish a cognizable constitutional violation and that the right in question (in

9

this case, the Fourteenth Amendment Due Process Right to be free from excessive use of force)  was clearly established on January 30, 2007, so that a reasonable officer would have known that what he was doing violated federal law.

The Eleventh Circuit has established that the use of excessive force against a pre-trial detainee under the Fourteenth Amendment, *i.e.* the use of force "maliciously and sadistically to cause harm," is unconstitutional. *See Johnson v. Breeden*, 280 F.3d 1308, 1321-1322 (11th Cir. 2002); *see, e.g., Whitley v. Albers*, 475 U.S. 312 (1986).

Under the Fourteenth Amendment, the pre-trial detainee has a right to be free from conditions or deprivations that are "wanton, arbitrary, or intended to punish." *See Telfair v. Gilberg*, 868 F. Supp. 1396, 1403 (S.D. Ga. 1994)(citing *Bell v. Wolfish*, 441 U.S. 520, 536-537 (1978)); *see also Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993)( citing *Graham v. Connor*, 490 U.S. 386, 395, n. 10 (1989) (Fourteenth Amendment protects a pre-trial detainee from the use of excessive force that amounts to punishment).

Under this standard relative to the use of force, "whether or not a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005)(citing *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987)); *see also Campbell v. Sikes*, 169 F.3d 1353 (11th Cir. 1999).

The first question in the present case is whether Brusoe's actions violated the Fourteenth Amendment Due Process Clause under the clearly established law.

Taking the facts and all inferences in the light most favorable to Roeber, the undisputed facts show that Brusoe's actions did not violate the Fourteenth Amendment Due

Process Clause. Roeber, who had been drinking prior to her arrest, had caused a disturbance by repeatedly demanding water and banging on the cell door. Further, when the deputies arrived at Roeber's cell, the cell was flooded by water coming out of the toilet. Because Roeber was the only person in the cell, and the deputies heard the toilet flushing repeatedly, the deputies concluded that Roeber had intentionally flooded the cell. The deputies saw Roeber standing on top of a bench inside the cell "hollering" at the deputies, and they determined that Roeber would need to be restrained to restore order and safety.

Roeber testified that deputies entered the cell, but she could not remember who pulled her down from the bench and placed her face down on the cement floor. Once Roeber was on the floor, Brusoe "grabbed" one of Roeber's legs (he thinks that he grabbed the left leg) in an attempt to control her leg movements. Eventually, he managed to shackle her right leg to the bench. Grabbing one of Roeber's legs and securing the other leg to the bench with a restraint was Brusoe's only physical contact with Roeber during the incident. It was Makowiecki who is alleged to have placed his knee in Roeber's back causing the injury to her spleen and ribs.

Following the incident, Brusoe periodically checked on Roeber and eventually released her from the restraints. (Brusoe's Deposition at 61). Brusoe's actions represent the use of limited force in a good faith effort to restore order and safety. Roeber does not refute that Brusoe originally went to Roeber's cell with the intent to comply with her repeated requests for water, not for a punitive purpose. When he arrived at her cell and observed flooding inside the cell, he entered the cell to restore order by securing Roeber.

Finally, the deposition testimony of Dr. Michael A. Schremmer shows that Roeber's injuries -- a ruptured spleen, a non-displaced left rib fracture, and a "tiny fracture" of the left

11

L2 transverse process resulted from a trauma to her back. (Schremmer's Deposition at 17). It was Makowiecki who allegedly pulled Roeber from the bench and placed his knee in her back. Dr. Schremmer testified at deposition in response to a hypothetical question presenting the facts of this case, that pressure from a knee in the back could have caused Roeber's injuries. Makowiecki and Brusoe agree that Makowiecki took Roeber down from the bench and that Makowiecki placed his knee in her back in an attempt to restrain Roeber. Roeber testified that her legs were not hurt during the incident. Nowhere in her deposition testimony does Roeber allege that the deputy who secured her legs caused her any pain or injury.

### Disputed Facts According to Roeber

Roeber alleges, in her memorandum in opposition to Brusoe's motion for summary judgment (Doc. No. 14), that the following disputed facts raise genuine issues of material fact to preclude summary judgment for Brusoe:

> 1. The Plaintiff maintains that the toilet in her cell was filled with feces and paper, and that the faucet was not working, which caused her to ask repeatedly for water. (*See* Roeber's Deposition pg 101, lines 6-10, already filed herein by the Defendant as Exhibit 4 and 5 to his motion, at DKT. 13.) The Defendant testified that the faucet was working, and saw no feces in the toilet water when he entered the cell. (*See* Brusoe's Deposition, already filed herein by the Defendant as Exhibit 1 to his motion, at DKT. 13, pg 42, lines 19- 25, page 43, lines 1-2.)
>
> 2. The Plaintiff testified that she flushed the toilet once. (Roeber's Deposition Page 103, lines 17-18.) The Defendant testified that he heard the Plaintiff flush the toilet several times (Brusoe's deposition, pg. 40, lines 17-19.)
>
> 3. The Defendant stated that when he and his co-defendant entered the plaintiff's cell, the deputies asked the plaintiff several times to get off of the bench on which she was

12

standing. (See Brusoe's deposition, pg. 45, lines 15-25 and pg. 46, lines 1-1-12. The Plaintiff maintains that when the Defendant entered her cell, no one told her to get down from the bench. (Roeber's deposition, pg. 109, lines 21-23.)

4. The Plaintiff says she was pulled off of the bench and pushed face first onto the concrete floor, where her face was pushed back and forth into the overflowing toilet water by the defendants. Id., pg. 108, lines 7-15.) The Defendant maintains that the Plaintiff was slowly "walked down"off the bench by his co-defendant, first to her knees and then to her stomach, not slammed to the floor. (Brusoe's deposition, pg. 49, lines 8-13 and pg. 50, lines 13-22.)

5. The Plaintiff also testified that as her face was being rubbed in the toilet water by the defendants, they were taunting her: "Now you want—you want water? Now you got water."(Roeber's deposition, pg. 110, lines 17-21.)

6. The Defendant testified that when she was placed on the ground, the Plaintiff put both of her hands underneath her, and that she was swinging her hands and flailing her arms. (Brusoe's deposition, pg. 51, lines 21-25). The Plaintiff denies this. ( Roeber's deposition, pg. 117, lines 1-3, and pg. 118, lines 2-8.)

7. The Defendant testified that he grabbed and bent the Plaintiff's foot at the ankle to keep her from kicking him. (Brusoe's deposition, pg. 55, lines 20-22). The Defendant later testified that the Plaintiff kicked him "several"times. (Id., pg. 64, line 25 and page 65, lines 1-2. [Plaintiff] testified that she is certain that she never kicked the Defendant. (Roeber's deposition, pg. 117 21-25 and pg. 118, line1.)

8. The Plaintiff testified that she was in great pain after being handcuffed by the defendants, and that she tried to tell the defendants how badly she was injured. (Roeber's deposition, pg. 124, lines 15-22) The Defendant testified that after she was handcuffed, the Plaintiff appeared to be "fine"afterwards, that she was profane with defendant Brusoe when he checked on her, and that she did not appear to be in any kind of distress or pain. (Brusoe's deposition, pg. 60, lines 21-25 and pg. 61, lines 1-4.)

(Doc. No. 14 at 3-5).

The Court disagrees. Drawing inferences from the evidence in the light most favorable to Roeber and resolving all reasonable doubts in her favor, a review of the undisputed facts in the deposition testimony demonstrate that Roeber's alleged disputed facts do not raise genuine issues of material fact such that a reasonable jury could find that Brusoe maliciously violated Roeber's Fourteenth Amendment right to be free from excessive force as she alleges in her complaint. Furthermore, the disputed facts do not show that Brusoe used force maliciously and sadistically to cause harm to Roeber, but only to restore order and safety to the situation.

**Brusoe Did Not Have Duty To Intercede at the Time of the Incident**

Assuming arguendo, that Makowiecki's acts constituted excessive force,[4] the undisputed facts fail to demonstrate Brusoe was under a duty to intercede. The Eleventh Circuit stated, in *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008):

> "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir.2007) (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir.2002)) (quotation marks omitted). But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so. *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir.2000).

516 F.3d at 1331.

Roeber has not alleged facts to show that Brusoe was in a position to expect that Makowiecki was going to use excessive force in taking Roeber from the bench and restraining her during the two-point maneuver.

---

[4] Makowiecki did not file a motion for summary judgment.

No duty is placed on a law enforcement officer to prevent the use of excessive force unless the officer had reason to expect the use of excessive force before it occurred. *See Riley v. Newton*, 94 F.3d 632 (11th Cir. 1996). *Hadley, supra.* Brusoe could not have expected any excessive force by Makowiecki before it occurred because Roeber was brought to the floor "instantly" and Brusoe had no reason to anticipate that Makowiecki would use any more force than necessary to restore order and safety in the situation. In addition, Brusoe was a relatively new deputy, still on probation and under Makowiecki's supervision.

Brusoe could not have expected any excessive force by Makowiecki because, when Makowiecki and Brusoe were performing the two-point maneuver, Makowiecki's back was to Brusoe and Brusoe could not see what happened when Makowiecki took Roeber from the bench. Brusoe could not observe how Makowiecki was holding Roeber's wrist to force her to leave the bench or how Makowiecki was using his knee in Roeber's back to enable Makowiecki to handcuff her wrist to the bench. Brusoe's duty in the two-point maneuver, which did not begin until Roeber was on the floor, was to shackle one of her legs to the bench. *Makowiecki* also testified that his back was to Brusoe as he was taking Roeber from the bench.

Nothing in the parties' depositions supports any contention that Brusoe knew that Makowiecki would us any more force than was necessary at the time of the two-point maneuver. Likewise, nothing supports any contention that Brusoe *should have expected* any excessive use of force, as the two-point maneuver was used often in the jail without injuring inmates. Therefore, pursuant to *Hadley v. Gutierrez*, Brusoe had no duty to intercede on behalf of Roeber during the two-point maneuver.

**Summary**

Roeber cannot meet her burden to demonstrate that Brusoe's actions constituted the unlawful excessive use of force under the Fourteenth Amendment. Brusoe is entitled to qualified immunity, and Count II, Roeber's Fourteenth Amendment claim against Brusoe, fails.

**Standard of Review for Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *See id.* When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable

to the non-movant and resolve all reasonable doubts in that party's favor. *See Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences n favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The undisputed material facts show that Brusoe's intent in entering the cell was to restore order by securing Roeber, not to maliciously or sadistically harm her. Brusoe's use of limited force did not injure Roeber. His role was to secure her legs, which he did. Roeber did not then, and does not now complain of any pain in her legs. Brusoe is entitled to summary judgment as a matter of law.

Finally, should Makowiecki be guilty of the use of excessive force, Roeber cannot demonstrate that Brusoe either anticipated the unlawful use of excessive force or that he was in a position to intercede against the use of such force.

**Accordingly, the Court orders**:

That Brusoe's motion for summary judgment based on qualified immunity (Doc. No. 13) is granted.  The Clerk is directed to enter judgment for Brusoe.

ORDERED at Tampa, Florida, on June 20, 2008.

SUSAN C. BUCKLEW
United States District Judge

Counsel of Record